IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CV-664-D

| | |
|---|---|
| JAMES S. SYKES, ) | |
| ) | |
| Plaintiff/Claimant, ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-23, -25] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant James S. Sykes ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied and Defendant's Motion for Judgment on the Pleadings be granted, upholding the final decision of the Commissioner.

**I. STATEMENT OF THE CASE**

Claimant protectively filed an application for a period of disability, DIB, and SSI on November 19, 2009, alleging disability beginning November 23, 2007. (R. 65-66, 248-53). Both claims were denied initially and upon reconsideration. (R. 65-66, 89-90). A hearing before the Administrative Law Judge ("ALJ") was held on July 14, 2011, at which Claimant was represented

by counsel and a vocational expert ("VE") appeared and testified. (R. 23-62). On August 5, 2011, the ALJ issued a decision denying Claimant's request for benefits. (R. 10-22). On August 14, 2012, the Appeals Council denied Claimant's request for review. (R. 1-4). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3), 416.920a(e)(3).

If as a result of the above analysis the ALJ concludes that a claimant is disabled and there is medical evidence that the claimant has drug addiction or alcoholism ("DAA"), the ALJ must determine whether the DAA is a contributing factor material to the determination of disability. 20

3

C.F.R. §§ 404.1535(a), 416.935(a). If the DAA is found to be material, the claimant cannot be considered disabled under the Act. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."). The claimant has the burden of proving that the DAA is not material. *See Overstreet v. Astrue*, No. 4:11-CV-58-JG, 2012 WL 4355505, at *2 (E.D.N.C. Sept. 21, 2012) (citing *Bridgeman v. Astrue*, No. 4:07–CV–81–D, 2008 WL 1803619, at *3 (E.D.N.C. Apr. 21, 2008) (citation omitted); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (holding that a claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material to his or her disability)).

In making the materiality determination as to DAA, the key factor is whether the claimant would still be disabled if he stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). The Commissioner must evaluate which of the physical and mental limitations would remain if the claimant stopped using drugs or alcohol and then determine whether any of the remaining limitations would be disabling. *Id.* §§ 404.1535(b)(2), 416.935(b)(2). If the remaining limitations are found not to be disabling, the claimant's DAA is deemed a contributing factor material to the determination of disability, and the claimant is determined to be not disabled. *Id.* §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). However, if the remaining limitations are found to be disabling, the DAA is deemed not to be material, and the claimant is determined to be disabled. *Id.* §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).

In this case, Claimant alleges the ALJ erred by finding that Claimant's DAA caused his disability. Pl.'s Mem. [DE-24] at 9-11.

4

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. (R. 12-22). At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 13). Next, the ALJ determined Claimant had the following severe impairments: schizoaffective disorder, personality disorder, polysubstance abuse and dependence, and obesity. *Id.* At step three, the ALJ concluded these impairments, including the substance use disorder, met Listings 12.03 (schizophrenic, paranoid and other psychotic disorders) and 12.09 (substance addiction disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1:

> The "paragraph A" criteria are satisfied because the claimant has a history of psychotic features with deterioration from a previous level of functioning with intermittent persistence of hallucinations. The claimant also has behavioral changes associated with the regular use of substances that affect the central nervous system with an affective disorder and anxiety disorder.
>
> To satisfy the "paragraph B" criteria, the impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> In activities of daily living, the claimant has moderate restriction. In May 2011, he reported to his physician that he sleeps during the day. He also reported that he felt dysphoric because there were no changes in his life and that he was not meeting any goals. The claimant's global assessment of function (GAF) ratings have remained in the 40s for several years and across a variety of providers, indicating severe impairment of function (Exhibits 9F-12F, 14F-16F, and 18F).
>
> In social functioning, the claimant has marked difficulties. On May 5, 2011, the claimant's mother reported that he had recently voiced suicidal ideations. The claimant also reported at that time that he was able to read people's thoughts and felt

5

that people talked about him (Exhibit 18F).

With regard to concentration, persistence, or pace, the claimant has marked difficulties. On April 11, 2011, his psychiatrist, Shane Boosey, M.D., reported that the claimant acknowledged being high at the time of the interview and said that he wanted to cut the interview short. Dr. Boosey further stated that the claimant was not motivated for sobriety (Exhibit 18F).

As for episodes of decompensation, the claimant has experienced one to two episodes of decompensation. The claimant has a history of inpatient treatment for cannabis dependence, alcohol abuse, and a substance-induced mood disorder. His most recent inpatient treatment was in November 2009, when he had auditory hallucinations, paranoid thoughts, and suicidal and homicidal ideation. On December 30, 2009, Arnie Sharrits, M.D. reported that the claimant had poor tolerance for stress or change (Exhibits 3F-4F, 8F, and 10F).

Because the claimant's mental impairments, including the substance use disorder, cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are satisfied.

(R. 14).

The ALJ next determined that even absent substance use, Claimant's emotional disorders and obesity would still constitute severe impairments, but that if Claimant stopped his substance use, he would no longer have an impairment or combination of impairments that meets or medically equals a listing. (R. 15). Specifically, the ALJ found that Claimant's acute psychotic symptoms have abated when Claimant has been compliant with his medication treatment regimen and that, in the absence of substance use, Claimant would have only mild restriction in activities of daily living, moderate difficulties in social functioning and concentration, persistence, or pace, and no episodes of decompensation, failing to satisfy the "paragraph B" criteria. (R. 16). The ALJ further determined that the "paragraph C" criteria would likewise not be met in the absence of substance use. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC absent substance use,

6

finding Claimant had the ability to perform medium work[1] with additional postural, manipulative, environmental, and mental restrictions (i.e., no climbing ladders, ropes, or scaffolds; climbing ramps and stairs occasionally; bending, stooping, and kneeling occasionally; handling and fingering occasionally; no exposure to workplace hazards such as unprotected heights or moving machinery; limited to performing simple, routine, repetitive tasks in a low-stress job (defined as requiring no more than occasional decision-making and no more than occasional changes in the work setting); no production rate or paced work such as would be done on an assembly line; and no more than occasional interaction with the coworkers and supervisors (and where such interaction would be limited to superficial interaction such as brief greeting or exchange of information and/or where the interaction is incidental to the work being performed)). (R. 17). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 17-20).

At step four, the ALJ concluded that, even absent substance use, Claimant could not perform the requirements of his past relevant work. (R. 20-21). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined that, absent substance use, Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 21). Accordingly, the ALJ determined substance use is a contributing factor material to the determination of disability and, as a result, Claimant has not been disabled at any time from the alleged onset date through the date of decision. (R. 22).

## B.     Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 29 years old, unemployed,

---

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, he can also do sedentary and light work. 20 C.F.R. §§ 404.1567(c), 416.967(c).

7

and living with his mother. (R. 30, 49). He receives food stamps and his mother supports him otherwise. (R. 49). Claimant was diagnosed with attention deficit disorder as a child, but was not treated with medication. (R. 39). He was a slow learner, had problems in school, and was placed in special classes. (R. 35-36). He completed ninth grade at the Wilderness Camp for Boys. (R. 30). Claimant previously worked as a cashier, fry cook, dishwasher, and janitor. (R. 32-33). Claimant was fired from a job stocking and bagging groceries after only one day because he "cussed out" the store manager. (R. 33). He was also terminated from another job for talking inappropriately to a co-worker and after being fired from yet another job, Claimant told an employee he would "bomb the place and kill everybody." (R. 33-34). Claimant explained that he had difficulty working as a dishwasher, because he was too slow and felt like people were talking about him. (R. 34).

Claimant testified that his ability to work was impacted negatively by his mental illness, which causes him to be angry and paranoid (i.e., "I think people are out to get me"), and that he also has hand tremors and cannot multitask. (R. 33-34). He also testified that stress exacerbates his symptoms. (R. 34). Claimant can follow verbal instructions after being told two or three times and it could take three or four days for him to learn and remember how to perform a task. (R. 36). Claimant could not follow written instructions due to getting frustrated and quitting before finishing the project. (R. 36-37). His focus and memory are good at times and bad at times. (R. 38-39). He can fill out a job application, but has "bad references" and, as a result, has been unable to obtain work. (R. 36). Claimant has a criminal record, including disorderly conduct, marijuana and other controlled substance related conduct, vandalism, and solicitation of prostitution, and he was incarcerated for a short time before being transferred to the Central Prison mental ward. (R. 35). These incidents occurred before Claimant started taking medication for his mental conditions. *Id.*

8

Claimant has bipolar and schizoaffective disorders for which he takes Dapakote, Haldol, and Cogentin with no side effects. (R. 39-40). Prior to taking medication for these disorders, Claimant experienced auditory hallucinations and was hospitalized at a psychiatric facility on more than one occasion for two or three weeks at a time. (R. 40). He has not had any hallucinations since being placed on Haldol and currently experiences only paranoia. (R. 40-41). Claimant also had anger control issues and threatened family and friends. (R. 41-42). He described his current mood as "depressed" due to boredom and his inability to find a job. (R. 42). Claimant explained that he thought he might be able to do kitchen work, although he had problems performing such work before, and that both Target and Wal-Mart had denied him employment due to his criminal record. (R. 43). He also testified that he does not believe he can work because he does not have a GED, has criminal charges and bad references, and has not worked in three years, so that no employer would want to give him a job. (R. 48).

Claimant smokes marijuana every two to three days, but is trying to quit and attends church to help in this regard. (R. 46). He smoked crack cocaine three weeks prior to the hearing, but cannot regularly afford to purchase crack, and snorted powder cocaine for two years when he was 22 years old. (R. 49-50). He had not used alcohol in five months, but prior thereto drank a fifth of liquor with his friends two to three times a week, and did not perceive this as a problem. (R. 45-46). Claimant attends a substance abuse class at Easter Seals and a drug counselor comes to his home once a week. (R. 50). Claimant was "clean" for nine months after he was released from Central Prison and was clean for two months a year or two prior to the hearing, but was "depressed and suicidal and everything" and "didn't have no friends or nothing," so he resumed using marijuana. (R. 52). On a typical day, Claimant sits at home until 1:00 p.m. or 1:30 p.m. then goes to a friend's

9

house where he sometimes smokes marijuana. (R. 48). He does his own laundry and is capable of doing other chores, but chooses not to. *Id.*

## C. Vocational Expert's Testimony at the Administrative Hearing

Theodore H. Sawyer testified as a VE at the administrative hearing. (R. 53-61). After the VE's testimony regarding Claimant's past work experience (R. 56-57), the ALJ posed the following hypothetical:

> Let's start off by assuming a person the same age, education and work experience as the claimant and let's say that that person retains a medium residual functional capacity with push or pull limited to the medium level with no climbing of ladders, ropes or scaffolds.
>
> No more than occasional climbing of ramps or stairs or balancing. No more than frequent stooping, crouching, kneeling or crawling with no more than frequent handling or fingering and with no exposure to moving machinery or unprotected heights.
>
> . . . .
>
> [L]et's also say work that would be limited to simple routine repetitive tasks in a low stress job which I would define as having no more than occasional decision making required, and no more than occasional changes in the work setting. And with no production rate or paced work such as would be done on an assembly line.
>
> And with no more than occasional interaction with the public or with co-workers. And such interaction would be limited to superficial interaction like a brief greeting or exchange of information and or interaction that would be incidental to the work that was being performed.

(R. 57-58). The VE testified that such an individual would not be able to perform Claimant's past relevant work. (R. 58). However, the VE opined that there would be jobs at the medium level that would accommodate the hypothetical individual, such as general laborer in the plastics industry (DOT # 754.687-010); goods layer in the fabric or textile industry (DOT # 781.687-038); and hand packager (DOT # 920.587-018). (R. 58-59). The VE additionally testified that there would also be

10

jobs at the light level that would accommodate the hypothetical individual, such as sorter agricultural produce (DOT # 529.687-186); bakery worker (DOT # 524.687-022); and remnant sorter (DOT # 789.687-146). (R. 59).

The ALJ next asked the VE to assume such a hypothetical person had further limitations, due to severe mental impairments, such that he was unable to sustain sufficient concentration, persistence or pace to do even simple routine tasks on a regular and continuing basis for eight hours a day, five days a week for a 40 hour work week or an equivalent work schedule. (R. 60). The VE opined that there would be no jobs such a person could perform. *Id.*

Claimant's counsel asked the VE to assume, in addition to the limitations given by the ALJ, the hypothetical individual had to miss at least three days a month due to his medical conditions. *Id.* The VE responded that the DOT does not specifically address absenteeism, but that in the VE's experience industrial norms allow absence of up to one day a month, so that such an individual could not sustain work activity. *Id.*

## V. DISCUSSION

### A.     The ALJ's DAA Assessment

Claimant contends that the ALJ erred by finding that Claimant's DAA caused his disability. Pl.'s Mem. at 9-11. As an initial matter, the precise inquiry is whether Claimant's DAA is a contributing factor material to the determination of disability, and the key factor in making this determination is whether the claimant would still be disabled if he stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(a)-(b)(1), 416.935 (a)-(b)(1). The ALJ thoroughly considered Claimant's mental disorders and the effects of Claimant's substance use, and the ALJ's assessment was in accordance with the law and supported by substantial evidence.

11

Claimant first asserts that the ALJ failed to cite any evidence to support that Claimant's mental problems would improve to the point of nondisability in the absence of DAA. In assessing whether Claimant's impairments would meet or medically equal a listing in the absence of substance abuse, the ALJ found that Claimant's acute psychotic symptoms have abated when he was compliant with his medication regimen; that Claimant is capable of performing self-care activities, household chores, and other activities of independent daily living in the absent substance use; that Claimant has anger management problems but is capable of interacting appropriately with family, friends, and his treatment providers absent substance use; and that Claimant has not required inpatient or emergency outpatient treatment for his mental conditions except for episodes associated with substance use. (R. 16). The ALJ noted in support of these findings that Claimant's mental status was reported to be stable on May 12, 2008 (R. 511); almost one year later in April 2009, Claimant returned to the mental health center and reported a relapse in cocaine use, continued use of marijuana and alcohol, and a stable mood with Depakote (R. 597-98); in November 2009, Claimant received inpatient treatment due to suicidal and homicidal ideation, testing positive for marijuana and a subtherapeutic level of Depakote, and he was placed on Haldol as the Geodon had been ineffective (R. 549-50, 580-82); and in December 2009, Claimant began treatment at Easter Seals where records reveal Claimant's mental status was generally within normal limits (R. 606-08, 627, 699-700, 703, 707-09, 715-16, 718-19, 721, 738). (R. 19). The effectiveness of medication in treating Claimant's mental conditions is significant to the determination of whether Claimant would be disabled if he stopped substance use. *See Finley v. Astrue*, No. 5:08-CV-209-D, 2009 WL 2489264, at *3-4, 8-9 (E.D.N.C. Aug. 13, 2009) (adopting memorandum and recommendation concluding that claimant with depression, bipolar disorder, and schizophrenia was not disabled where there was substantial

evidence that claimant responded well to medication and treatment and was hospitalized less and could care for personal needs absent substance use). Furthermore, "it is well established that '[i]f an impairment can be reasonably controlled by medication or treatment, it is not disabling.'" *Id.* (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)).

Moreover, the treatment records for Easter Seals reflect that Claimant's marijuana use contributes to his depression and paranoia and substantially interferes with his daily activities and ability to accomplish goals such as obtaining a job. (R. 606-08, 700, 707, 715-16, 739, 740, 742). Claimant also testified that he is unable to get a job because he has "bad references" and a criminal record (R. 36, 48) and told Dr. Sharrits that he wants to get a job but has a record and cannot pass a drug test because he smokes marijuana daily (R. 700, 742). Accordingly, there is substantial evidence in the record, cited by the ALJ, to support the ALJ's determination that Claimant's mental problems would improve to the point of nondisability in the absence of DAA.

Claimant next asserts that during the few periods of sobriety, his mental condition did not improve. For example, Claimant points to an August 2009 treatment note indicating Claimant had not been using substances, but experienced two weeks of suicidal ideation. (R. 594-96). However, the treatment note shows that Claimant's worry over having a sexually transmitted disease was contributing to his presentation, as well as the fact that he has "unstructured activities, sits around the house all day bored, and feels like he is 'not going anywhere.'" (R. 594). Furthermore, Claimant's medication was subsequently changed to Haldol after Geodon was determined to be ineffective (R. 580-82), and Claimant reported at the administrative hearing that his psychotic symptoms are controlled by his medications and that his current mood is depressed because he is bored. (R. 40-42). As discussed above, this testimony is supported by treatment records from Easter

13

Seals. (R. 606-08, 627, 699-700, 703, 707-09, 715-16, 718-19, 721, 738). Claimant also points out that he abstained from substance use while incarcerated for nine months, but that his symptoms did not improve. However, Claimant testified that this was prior to being placed on his current medications. (R. 35). Accordingly, the evidence cited by Claimant fails to show that his mental condition would not improve to the point of nondisability in the absence of substance use.

Claimant also asserts that because he continued to use marijuana during the periods during which his mental condition was characterized as stable, the records do not demonstrate improvement absent substance use. As explained above, the ALJ noted that Claimant's prior inpatient and emergency outpatient treatments involved polysubstance use, including combinations of cocaine, alcohol, and marijuana or were a result of a suboptimal medication regimen. (R. 19). Furthermore, while Claimant is stable in the sense that he no longer experiences acute psychotic symptoms, the treatment records indicate that marijuana use contributes to Claimant's depression and paranoia and substantially interferes with his daily activities and ability to accomplish goals such as obtaining a job. (R. 606-08, 700, 707, 715-16, 739, 740, 742). Accordingly, this argument fails.

Finally, Claimant contends that the ALJ erred by giving great weight to the opinions of Dr. Sharrits and Dr. Boosey, Claimant's treatment providers at Easter Seals, but only to the extent they reflect Claimant's condition when he is using drugs and alcohol because they never treated Claimant during sustained periods of abstinence. Claimant characterizes the ALJ's analysis in this regard as speculative. When making an RFC assessment, an ALJ "must always consider and address medical source opinions." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996). A treating source's opinion evidence is generally given more weight than other opinion evidence, and a treating source opinion must be given controlling weight if the ALJ finds that the opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see* SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). The ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by substantial evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5.

Here, the ALJ considered the opinions of Dr. Sharrits and Dr. Boosey and gave them great weight to the extent they reflect Claimant's condition when he is using drugs and alcohol. (R. 15). However, the ALJ discounted their opinions with respect to Claimant's condition absent substance use because they had not treated Claimant during any sustained periods of abstinence. (R. 20). As stated above, the records of Dr. Sharrits and Dr. Boosey are replete with references indicating that Claimant's marijuana use contributes to Claimant's depression and paranoia and substantially interferes with his daily activities and ability to accomplish goals such as obtaining a job. (R. 606-08, 700, 707, 715-16, 739, 740, 742). Accordingly, the ALJ did not err in discounting their opinions with respect to Claimant's condition absent substance use.

Similarly, Claimant contends the ALJ failed to mention the opinions of the state agency doctors who determined DAA was not material to Claimant's disability. The ALJ did, in fact, consider these opinions, but noted that they did not properly apply the Social Security guidelines for evaluating cases involving a substance disorder. (R. 15, 20). It is also noteworthy that these doctors determined Claimant was not disabled. (R. 76, 102). Accordingly, the ALJ did not err in evaluating the medical opinion evidence.

15

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-23] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-25] be GRANTED, and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

SUBMITTED, this the 18 day of December 2013.

Robert B. Jones, Jr.
United States Magistrate Judge